May it please the Court, my name is Lee Rowland, I am attorney for the plaintiff's appellants in this case. With me here and on the briefs is Alan Lichtenstein, General Counsel for the ACLU of Nevada. We are here today to discuss a series of ordinances passed by the City of Las Vegas that dramatically reduce access to public park space. It is our contention that the manner in which the City of Las Vegas has reduced access to public park space violates the First, Fifth, and Fourteenth Amendments. The two major substantive issues in this case that we'll likely be discussing today are whether or not the Las Vegas Permitting Code writ large, including all of its aspects, insurance requirements and the like, violates the First Amendment in its over breadth and its vagueness, and whether or not the City's trespass policy or policy of 86ing, that's the colloquial term, whether that violates the vagueness and due process standards. The lower court, as well as our opponents, we believe erroneously relied pretty much entirely on one case for each of those propositions that we believe in their own terms are inapposite to the specific facts that we have in these cases. I'll first begin with the Permitting Code. The lower court held that the permitting ordinances at issue in this case were completely unconstitutional based solely on the holding of Thomas v. Chicago Parks District. Thomas is a somewhat unique case that deals only with the question of whether ministerial regulations of access to public parks, for instance, coordinating different groups who want to be there at the same time, ensuring that the City has notice of large parades, whether those incur the very strict prior restraint requirements based on old case law such as Friedman v. Maryland. Would you mind me asking you just to back up for a moment and address the standing question? There are two different permitting schemes. There's the group use and there's the special events permit scheme. There's an argument that there's no standing on behalf of your clients to challenge the special events permit scheme because it's interpreted as applying only to 400 people or more having some stage production. Absolutely, Your Honor. We actually believe that our plaintiffs have standing to, or the appellants have standing to challenge the special events ordinances in two different ways. Number one, there is a fact, indisputably in the record, it's in ER 88, which is that our plaintiff has alleged that she frequently uses a microphone at her events. The administrative regulation that defines a special event says it's 400 or more The district court did not make a decision. Obviously, it may or may not. That's correct. A bullhorn could use batteries. Certainly, and I'll explain more. Before we litigated this case, our clients tried for months to informally work out with the city, as is here in the declarations, how to be in the parks. And she repeatedly mentioned the onerous insurance requirements. The insurance requirements only apply to those special events. There are no insurance requirements for the normal 25 or more people events. At no point during the months of negotiations in which I was involved, in which the client was involved, did anyone at the city mention to her that she was not subject to these events. In other cases where administrative limiting instructions have been given deference by the courts, and that's clearly the standard practice, there are two requirements. Number one, that it doesn't contradict the plain language of the statute. And number two, that it be a formal adoption, either by, you know, binding regulation or that it's incorporated into the statute. I understand, just for clarity purposes, you're relying solely on that aspect of the administrative regulation that deals with supplying power. No, Your Honor. So if that was not in the regulation, would you still assert that you have standing because of the 400 reasons? Absolutely. For the reason that there is a chill factor here, and it's very real. As I noted, my client attempted to work out with the city how she might engage in sharing food with the homeless. And mentioned that the particular sticking point for her was these insurance requirements. She was never told at any point that these did not apply to her. And notably in other cases in front of the circuit, for instance, Santa Monica Food Not Bombs, as we've cited in the brief. Go a little slower. Sure. I know you have a lot to say. I want to make sure I understand all of your words of wisdom. Of course, Your Honor. I apologize. All right. So you're saying basically that anybody basically can challenge this 400 criteria under the administrative regulation. Anybody, I guess. I wouldn't say anyone, Your Honor. I would say someone who is chilled by the plain meaning of that statute. And here It's a bit of a stretch here to me. Are you really perhaps better off relying upon the alternative under that administrative regulation requiring anybody who uses any power or plans to do that to also have to comply with those stricter requirements? Well, first I would say, my first argument is that plaintiffs fall directly under the administrative definition of 400 or more because of their use of power. Because of the use of power? First. That's my first argument. And that's explicit. She's explicitly covered by the language of the administrative regulation. However, my alternative argument is that this is not a true limiting construction for two reasons. Number one, it completely revises the plain meaning of the ordinance because it goes from 25 to 400 people. And the entire purpose of this regulation is to set a numerical floor. There is no other purpose. The entire purpose is determine a number. And the city council, in passing the special events ordinance, the language of the special events ordinance actually says, quote, including without limitation picnics. It said when you look up the code, it says any group of 25 or more including without limitation picnics is a special event. No one knows that the administrative regulation, there's no incorporation of administrative regulations, there's no reference until you actually apply. No one is informed that it's 400 people. And as I noted, my client met with the city repeatedly over a series of months in order to find an informal or creative way to avoid the insurance requirements and was never told over the series of months that that regulation was actually applied to 400. And what's critical in other cases for this Court when they defer to an administrative regulation is that it actually provide notice to the public. And here it's not simply hypothetical. It's actual that there was no notice to my client that she did not fall under this and she unquestionably in her declarations noted that she avoided activities in certain parks and was chilled by the definition of the statute which we believe gives us standing. And even if it applies to her logically, under this Court's precedent, we would still have third parties standing based on the over breadth of including every I have this language from Plain Dealer which sort of spells out to us that we're to rely on the authoritative construction and it says this rule applies even if the face of the statute might not otherwise suggest the limits imposed. Are you saying we should distinguish that based on a notice question as to whether why wasn't she on notice about this park brochure which apparently was handed out to everyone who was interested in reserving space? It was first handed out to my client in discovery in this case after she'd been dealing with the city for months. And clearly part of that, you know, throughout our briefs we've alleged that there's an animus towards our client. I believe that's part of this. And because there's no formal incorporation of the administrative regulation, that's a critical way that it can be abused that certain people are given that information and certain are not. Is this available at the park's office? Presumably it is, Your Honor. However, my client went there several times and, as I said, met with city park officials and was never given that brochure and clearly indicated that she thought she was subject to the insurance requirements and no one ever corrected her. But more importantly than your cite to Plain Dealer, there may be some differentiation in the cases, but it clearly states in SOC v. County of Clark, the Ninth Circuit and that's cited in our brief, Ninth Circuit plainly says we do not have to give deference to any administrative regulation that goes against the plain meaning of the statute. And here I would argue the entire meaning is setting that number. So upwardly revising it by literally 1,600 percent cannot fairly be termed a limiting construction. Well, I mean, it's sort of limiting in the opposite way. So in other words, it's not 25 people that are special events according to the little brochure. It's 400 or more. So in other words, it limits it to say, okay, it could be over 25. It's 25 or more. But we're not going to use that floor. We're going to make it higher before we impose something. So first you have to have 400. So if she doesn't have 400, she doesn't fall under that part. However, if you have less than 400, but you need certain facilities, then you are a special event. I mean, that's basically. Yes. And under that description, Your Honor, I would say that the critical requirement is that there be notice or incorporation of that administrative regulation, because if it really is 400, it would not have chilled my client's activities. She was operating under the assumption it was 25 because it's the plain meaning of the statute, and I believe it was reasonable for her to do so. I hear this and I say, I don't know why you're in the Ninth Circuit, why you guys don't talk to each other. It's 400. She can go there, right? Mm-hmm. I wish we'd been told as well, Your Honor. But you were told. Apparently in litigation you had every opportunity. That's correct. She now knows she can go there, right? Right. And our challenge here is the legal issue of that's not an appropriate administrative regulation. And for all we know, there are third parties out there that this Court should rightly be concerned about that are avoiding events because they're looking up the statute in the code and it says 25. But, you know, I don't have the case before me, but the Supreme Court has indicated that a judicial interpretation of a statute is sufficient to narrow it, and that wouldn't be incorporated in the code either. So I'm not sure that your requirement of notice of incorporation is really supported by our case law. I think it's supported by S.O.C., and I think it's supported by Food Not Bombs. And we cited those in the briefs where it says that's not – it's not a limiting administrative regulation if it completely revises the premium. Now, you only have 4 minutes and 34 seconds. Yes. I would like to move on. Other profound issues I think you might like to address. Very much so, Your Honor. Thank you. With respect to the permitting ordinance, the lower court relied entirely on Thomas v. Chicago Parks District, which, as I noted, is a unique case about whether or not there is ministerial ability to control park space. This case differs from it so markedly in two critical ways. The entire theory of Thomas was that ministerial exceptions were permitted because it was content-neutral and there were no discretion. Here there are two fatal flaws in the permitting code, which are, number one, it includes a right to deny a permit for any activity that may disturb or annoy people. Number two, it includes witnesses. We think that's the fatal flaw, and it kills the permit code. That flaw permeates every single aspect of the code as well, because no one 14 days ahead of time is going to be able to guess whether or not there may be 24 witnesses to an event. And as the Supreme Court has noted in cases like Forsyth County and the Hustler Magazine case, again, both cited in our briefs, the issue there is that the problem with relying on Forsyth, it seems to me, is that in Forsyth it was quite clear that the government officials had to look at the content. And that's made clear in Forsyth. So we don't have that. In Forsyth and in Hustler, the Court made it clear that the reaction of witnesses is content-based. The reaction of witnesses to speech is not a content-neutral basis for regulation. They were assessing how much it would feed the charge. They had to gather information in order to make that assessment. And that's what triggered the Court's speech concern. And here there's no, you know, I mean, the argument I think you're saying is, well, if you have more controversial speech, then you might get more people to show up. You may or may not. Hustler says explicitly that that's unconstitutional. It says that gauging the reaction of speakers to the speech is a content-based regulation. But they're not really saying that all they're saying is not the city making that determination. They're saying you, if you're going to have a group event and you think there's going to be more than 25 people for a group event, then you need to do certain things. Well, there's no way to tell. Well, to my mind, I don't disagree with that. But it says you have to make a reasonable estimate. So it seems to me the question would be, if you make a reasonable estimate and you say, you know, we didn't really expect more than ten people at my Girl Scout picnic or my feeding of the homeless today, you know, so I reasonably made a judgment. And then if the city went after you, then it would seem to me you might have an as-applied problem. That is what happened here, Your Honor. That is what happened. Okay. So tell me where. In the declarations there are several allegations by our client that literally every day the count was made a different way. Whether it was people holding plates, whether it was people chewing, whether it was people in the park. She said she literally could not figure out what the system was and had asked a series of marshals how they were interpreting it and no one could give her a straight answer. She was then arrested when 26 people or she was cited, excuse me, when 26 people in the park all were holding the same form of paper plate. Again, this was not an issue where she knew. And this, you know, as we've argued in our brief as an alternative theory, of course, that charity is directly protected expression. And for her, what Gail Sacco, our plaintiff, does is go where she's needed, which is she goes to parks where there's an existing homeless population and attempts to minister to them. She believes in the spiritual works of mercy and that this is a mandate of her religion. So for her, trying to estimate how many people have fallen through the city of Las Vegas' social net is virtually impossible. I see I have less than a minute remaining. I'd like to reserve it for rebuttal. Thank you. It is Las Vegas. As a Los Angelino, I just need to say that. Good morning. May it please the Court. My name is James Erbeck. I represent the city of Las Vegas. As you've heard and as you know from the briefs, the activists or the ACLU, whatever is most to this series of ordinances that seek to coordinate the public use of public parks to minimize damage to the parks, to especially coordinate use of reservable areas so that two groups don't show up and get into a fight because they thought they had that same area. The ordinance as set forth, it's clearly not content-related. And the application of the ordinance is as to time, manner, and place. The affidavit submitted in the record on appeal by Roy Nelson, I believe it's volume two, debates numbers 103, talks about how the applicant or the person seeking a reservation for his and in at most 30 minutes get the permit or reservation. He, in his affidavit, says he's not familiar with any that were denied except when it was conflicting requests for the same area in a park. Now, their affidavits say they met with city officials and they said there's no way you're going to get a permit. We don't want to have these activities in the park. So I'm not talking about what the city attorney might have said in court, which would not be evidence, but what the affidavits say about meeting with city officials. So why doesn't that show at least in an as-applied way that they're being denied the right to use the parks? Well, I'm not familiar with the facts, all the facts that occurred during that conversation with whatever official. The record is quite sparse below in terms of what was said when, where, to whom. If it's this Gail Sacco, who said it, exactly what was said. All I know is from the record, it's clear that the consideration given to an application for a reservation is based on time, place, and matter and is not contact. The record basically, there's some statements here that the city doesn't like, basically, these people in the park feeding the homeless. The district court took care of part of that. But how are they supposed to determine in advance whether 25 people are going to show up or not? Well, it depends on where the park is. There's not many parks in Las Vegas. Well, there's 68. 68, and they don't just spring up. So we know there's 68 parks and there's only 15 of them that are even permissible for reservation. Correct. And that's a city of 2 million now. But the reservable ones, the ones that are large enough, that have enough parking, have enough bathroom facilities, that have enough shade, trees or overhangs, those are the ones that are reservable because they're big, because they have those amenities. The smaller parks, such as the one that was the problem here, Circle Park, was a three-acre park in the middle of a divided parkway of cars, which went originally built, I think, in 1942. You know, there's two issues. One is, are the reservable parks too constricted? But let's just stick with the reservable parks now. Let's leave Circle Park out of this. We've got 15 parks where you can ask for a permit. How do you even know who's going to show up? Let's say I want to go out there and spout off about A, B, or C. How do I know if one person's going to come listen to me? And what do I do if, you know, 28 people show up and I don't have a permit? The individual entity or person that is going to give this, let's call it an event, whether it's giving out food or filming a TV show and giving away free cars, should be able to reasonably anticipate, as the statute talks, about how many people are going to show up. If you're going to give away 500 cars, you're probably going to have 5,000 people show up or more. Well, it happens, like in the case that they have in their affidavits, where, you know, what if somebody comes by for a minute? Are they one of 25? What if there's 26 people with plates instead of 25 people? The allegations are that they've been told nobody knows how those numbers get counted, so they don't know if they're going to get ticketed. I don't know who they were, according to the record, who they were told that by. They have never applied for a permit, any of the people of the appellants. The enforcement clearly is in a reservable part. This was not a reservable part that they were using, but if it was a reservable part and you get a permit for 28 people, you expect 28 to get a permit and 150 show up, I would expect the city to say, now you know, here's a warning about how many people showed up in the future. Please pay the appropriate fee. But what do you do if you just go to a park that's not reservable because you don't think 25 people are going to show up? You just go to a park and you've seen 10 homeless people there that often spend the day at that park, so you go there to give people food and then word gets out and more people show up. So then what do you do? I mean, you didn't expect 25, so you didn't even look at a reservable park. Can you do that? The person or the entity giving out the food before that one event didn't reasonably anticipate there was going to be much more. The next time they would, when they have to go get a permit, reasonably anticipate since the first time they had a permit. Are you saying that the city in effect agrees to a one free pass so you can establish a baseline? Based on the requirements of the code, the municipal code, it says they have to apply for a permit if they know or reasonably anticipate. Now, if they don't know and they don't reasonably anticipate more than 25, they wouldn't need a permit that first time. But if 125 people showed up, then they'd know. They could also anticipate that more word would get around and it might be up to 190 people, whatever is reasonably anticipated. What do you make of the argument, though, that if you're engaged in speech and some of it is unpopular, you're more likely to have more people and therefore this is basically this observer or I guess not observer but participant or witness language puts a burden then on speech because you've got to pay 50 bucks every time you want to say something that you think enough people want to come listen to. Well, I believe it's still ascertainable in terms of reasonably anticipated. If you're going to have Barack Obama show up versus someone who lives on the street give a speech, you're going to have a lot of people show up for Barack Obama and you would probably be required to get a special event because he would want electricity for a teleprompter or... Let me see if I can interject a concern or two that I have. I imagine if you're going to have a permit system which is going to be based upon some numerosity, whether it's 25 here or 50 as in Thomas and that ordinance talks about a public assembly, etc. involving more than 50 individuals. I guess you have to have some way of calculating how many people the city may use as a criteria for requiring a permit for all the good reasons that a permit may be required. But I'm just troubled by the fact that the ordinance includes witnesses and that's mentioned throughout all the papers that we've read and I just wonder whether or not you might agree that that is somewhat vague and perhaps runs afoul of the constitutional principle that you can't have criteria or standards that are void for vagueness. Isn't it kind of vague? I mean, they have no control. It's one thing if you can reasonably anticipate and I guess that's not inappropriate, but how can you reasonably anticipate witnesses, whoever they may be, appearing and not being? It seems that you have no control over that. I mean, is that something that should concern us in terms of the constitutional concept of vagueness? I still go back to the reasonable anticipation side of it. It depends on what you're doing, what the permit is for. Now, witnesses, it depends on how you define witnesses. Is it the media that shows up to film this event because it's newsworthy? Isn't that the problem? How do you define it? How is it defined? Maybe they should be defining what witness means. Well, if they're not part of the group taking part, if they're just standing off to the side. Itinerant people, I mean, will be included in that concept of witnesses. It could be intended witnesses. It could be unintended witnesses. I guess that troubles me a little bit. Well, if they're unintended, then they're not reasonably anticipated and they wouldn't come within. They shouldn't come within and no deputy marshal should count them in. So let me, so for example, let me see if I understand this. If you're having a family picnic or barbecue or family reunion, you don't expect people to come and witness it. But if you're having Barack Obama, then you do expect witnesses. And so if something odd happened at the family picnic and all sorts of witnesses showed up, it wouldn't be reasonably anticipated, so you don't fall within the strictures of the permit requirement. Is that what you're saying? That's what I'm saying, yes. But how do you know? I mean, you don't know, for example, that the media is going to show up. Are they a witness or no? I would believe not. Why not? How would I know that? Because they're not taking part as a group member of the event. Well, that's a participant. It says participate or witness is the language. I think the difficulty I'm having is that you can't even tell us what a witness is, which gives me pause of wondering how the officer on the ground is going to figure it out. In other words, there's not any criteria for anybody to figure out what that means. Well, the criteria would be what was established at the first event. Yeah, but so what happens if you have a spontaneous event? Let's say the mayor does something outrageous and you say, Oh, my God, this is unbelievable. Let's get a couple of people together and go to the park and basically be like in London and get on our soapbox and start talking about this. I don't know how many people are going to show up. Well, they can't overrun a public park. So if they do overrun a public park and it becomes unsafe, then there's other avenues, code or statute. Right, but what if I just march out of City Hall and I'm steamed up and I get down there and it turns out other people are and the people who are at the hearings start following me and pretty soon I've got 40 people listening to my great speech. Am I now apparently in violation? If I'm at a park that doesn't have group events, that's bad. But then if I'm one that has group events and I don't have a permit, because I just ran out and wanted to start talking. So then what happens? Well, you, I guess, would become an event manager. And when you started talking outside this building and you attracted, with your eloquence, 40 people, there wouldn't be a need for a permit in Las Vegas. But the next time you do it, you reasonably anticipate that because you've already established your eloquence and you attract 40 people to this event, then you would need to get a permit. The city, I guess, just to be clear, would be willing to basically You write that into these regulations that, you know, reasonably determined means that if you don't have any experience and you don't have any basis to make a reasoned judgment, then you're not going to get ticketed for that. I don't see any problem with that. You could do that. You could create an ordinance of that nature, I suspect. I would expect so. You know, explanatory regulation or whatever. That would be reasonable and based on what was already experienced. Did this case go to mediation in the Ninth Circuit? I don't believe so. I'm kind of new to the city office, but I don't believe it did. Well, at least you don't bring any history. The other void, vagueness issue I have is the word annoyance. That's pumped up as well. And wow, you know, that really just troubles me intuitively. That's another way in which this ordinance perhaps to mediation or whatever could be fine-tuned to avoid some of these problems that face us today. I probably shouldn't, but I completely agree with the Court. I've had cases where annoyance is such an eye of the beholder word that it can be interpreted differently by the different recipient of the data. So if this had gone to mediation, I mean, that's an obvious word. I agree with the Court. So does that mean that assuming you can figure out whether you need to get a permit, then the permit can be denied based on this annoyance factor, which would be, as I think in Thomas they refer to it, the unbridled discretion problem. Are you saying that the statute does allow unbridled discretion in the decision-makers in Las Vegas? No. I'm not saying that. What I'm saying is the annoyance word comes up once the event starts, and it's supposed to be a discussion of the homeless and handing out sandwiches, and then some participants or other homeless show up or even some walkers by start screaming, yelling and causing a major disturbance. A homeowner across the street might call the police and say, hey, I'm very annoyed by what's going on across the street. But the annoyance point, because I see you're out of time, actually. Just a quick question. The annoyance point is only in the, as I read it, in the ordinance which allows the director to deny or condition the issuance of a permit. Okay. Isn't that right? I believe so. He just says you can't. He could deny a permit to ensure that a group use does not disturb or annoy neighbors, basically. Why does it have an unbridled discretion, give the director unbridled discretion? He said it did not. Well, it's discretion. I don't think it's unbridled. Many of us know what an annoyance is, but I agree with the Court that some of us find things annoying that others don't. So I'm not prepared to take issue with the Court's suggestion that annoyance is a problematic term. All right. Thank you. You've used up your time. Thank you. Thank you. Let's see. I have quite literally seconds left. Your Honors, I'd like to respond to the free pass idea. Certainly it's the first we've heard of it. And what I can say is the facts in this case are the polar opposite of what has just been described as the city's generous nature. It's a gift to us in the mouth. Yes. Fair enough. But here's the problem. With respect to our clients, what that means is they can engage in charity once. Let's be clear. The City of Las Vegas has criminalized charity. Why can't you get a permit? They say we'll issue you a permit in 30 minutes. Well, for our plaintiffs, again, one of the reasons we've made the First Amendment argument that charity is protected for swimming activity is because she believes that it is an infringement on her rights to pay $50 every time she wants to go into a park to an existing population and share food with them. She's not coming into a park with 26 people. She's coming into the park by herself and maybe with a friend who helped her cook food. And what the city has decided is that whenever you're giving charity to someone in a public park, you're part of an organized event. And I would submit to you that Thomas and the other cases about ministerial exception only permit prior restraint, which is what notice is to the government of when you're going to be speaking in a public park, when there is an acute reason to do so, which is the regulation of that park space. Here, that reason is destroyed when those people are already in the park. They are already placing the burden on the park. What Ms. Sacco is doing is coming to share free food and water with them. If witnesses were defined differently, in other words, these people are already at the park, you're saying, the homeless who happen to congregate at various parks. Yes. So you're saying if it were defined differently and she were coming with her group, which are probably less than 25 people, then that would be another way that she wouldn't be in violation of the regulation. It depends on how you define witness. That's correct. And as the record shows, she tried to nail down individual marshals as to how they were doing it so that she could abide by the regulation. She was willing to do something as inherently against her nature as restricting her paper plates to 25. Do the records show what the size of the homeless population is in various parks? Is there anything in the record? No. Other than that, there are declarations from my client that the general parks where she finds the most need, such as Baker Park, are generally not reservable or not available to her. Let me clarify one thing. You're not contending that the City of Las Vegas can never require a permit for the use of a park, are you? No, I'm not. Okay. Of course not. So how do you draw the line? How do you script the proper permit application? Well, I think, number one, you know, our argument is that for permit regulations there are four factors in the circuit, that they have to be content-mutual, they have to be narrow-scaled. I'm just asking you what kind of permit would you create if you were writing with a clean slate? If I was writing with a clean slate, what I would say is that there would be a common-purpose requirement that there would be you could absolutely, reasonably anticipate a certain number of people, but I would absolutely draw the line at witnesses. It has to be participants. That seems to be something that's a repeating theme here. Absolutely. And frankly ---- How would you define participants? So if I am going to give a concert, but I don't need any power, and it's free, so I'm not a special event. I'm a potential group event. I sure hope more than 25 people show up to hear me play in my concert. Is everybody a participant who shows up?  I think in that situation it might depend on the method of advertising. And I know this was an issue in Santa Monica Food Not Bonds as well. There was one provision of that permitting scheme that says for the purposes of this section, if somebody advertises it is deemed to be a group of 150 or more, which was the number set as reasonable in that case. Incidentally, I would like to add for the record that 25 is way too low. With respect to Food Not Bonds in that case, they said you can't do that without being clear that once they get there, those people are actually engaged in a common purpose. Because what the problem is, is you end up taxing people who may advertise something and only three people show up. And so that's precisely what the Ninth Circuit has previously been concerned about, is it's kind of a combination of the two, which is both a reasonable anticipation, possibly combined with advertisement or reasonable expectation, but also the actual number of people who show up. And clearly I think if everybody shows up and you're having literally open admission and you're inviting people to come join your group indiscriminately, yes, I think it is okay based on the language in Santa Monica Food Not Bonds for that to require a permit, only providing that it actually does result in that number of people. And that's precisely what the Ninth Circuit has said, and I think that would be the right balance to strike here. Thank you. Thank you very much. I thank both counsel for your argument this morning. The case of Sacco v. the City of Las Vegas is submitted and we're adjourned.
judges: McKeown, Ikuta, Block